IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JANUARY 1996 SESSION

FILED

March 30, 1998

Cecil W. Crowson
Appellate Court Clerk

| STATE OF TENNESSEE, | ) | |
|---|---|---|
| | ) | |
| Appellee, | ) | No. 01C01-9506-CC-00182 |
| | ) | |
| | ) | Giles County |
| v. | ) | |
| | ) | Honorable James L. Weatherford, Judge |
| | ) | |
| JOHNNY WAYNE TILLERY, | ) | (Possession of cocaine with the intent to sell) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

Rogers N. Hays
Robert D. Massey
P.O. Box 409
Pulaski, TN 38478
(AT TRIAL)

Robert D. Massey
P.O. Box 409
Pulaski, TN 38478
(ON APPEAL)

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
        and
Ellen H. Pollack
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

T. Michael Bottoms
District Attorney General
P.O. Box 459
Lawrenceburg, TN 38464-0459
Assistant District Attorney General

OPINION FILED:_____


AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Johnny Wayne Tillery, appeals as of right from his conviction by a jury in the Circuit Court of Giles County for possession with the intent to sell cocaine, a Class B felony. As a Range I, standard offender, he received a ten-year sentence in the custody of the Department of Correction and was fined twenty-five thousand dollars. The defendant contends that:

> (1) there is insufficient evidence to support his conviction;
>
> (2) the trial court erred by admitting evidence of various weapons;
>
> (3) the trial court erred by allowing the state to introduce evidence of cocaine sales by other individuals;
>
> (4) the trial court erred by admitting and failing to redact portions of a tape recording;
>
> (5) the trial court erred by denying the jury instruction the defendant requested on circumstantial evidence;
>
> (6) the trial court erred by denying the defendant's requested jury instruction on constructive possession; and
>
> (7) the trial court erred in sentencing him.

We affirm the judgment of the trial court.

This case involves cocaine that Tennessee Bureau of Investigation (TBI) agents confiscated during an April 17, 1991, raid of the Boondocks Saloon in Elkton, Tennessee. The defendant is the owner of the Boondocks Saloon, and the raid was the culmination of a sixteen-month sting operation during which TBI agents bought cocaine from different people at the bar, including Ricky Brooks, who leased and operated the bar, and his employees.

At trial, Milton Bowling, a special agent with the TBI drug enforcement unit, testified that in the early part of 1990 he began investigating an alleged cocaine trafficking group that was reportedly working out of the Boondocks Saloon. He went to

2

the bar on January 17, 1990, with an informant and was able to purchase two grams of cocaine from Sonny Willard. When he arrived at the saloon that night, the defendant was seated at the bar. Agent Bowling said that the cocaine buy took place at a table that was away from the bar and that he did not know where the defendant was during the transaction.

On January 30, 1990, Agent Bowling returned to the bar with an informant who purchased cocaine from Terry Thompson. The defendant was seated at the end of the bar, and Thompson and the informant were seated toward the middle of the bar when the transaction took place. Agent Bowling stated that the defendant was not within hearing distance of the transaction and that Thompson passed the drug to the informant in a secretive manner below the bar.

When Agent Bowling returned to the bar with an informant on February 7, 1990, the defendant was again seated at the end of the bar. The informant approached Ricky Brooks who told her that he could not leave the bar and instructed Linda Willard to make the sale. The informant then went to the restroom where she purchased cocaine from Willard.

On February 14, 1990, the informant spoke to Brooks at the bar. The two then left the bar area and walked toward a pool table where Brooks sold the informant some cocaine. The defendant was seated at the end of the bar.

On February 21, 1990, Agent Bowling went to the Boondocks Saloon with another TBI agent, Ron Gaskins. The defendant was sitting at the end of the bar. Agent Bowling recalled talking to Brooks and purchasing an eight ball -- an eighth of an ounce of cocaine -- from him in the restroom. He described the cocaine as being in plastic that was wrapped in tinfoil. He said that he gave Brooks three hundred dollars

3

and that the purchase price was two hundred and seventy-five dollars. He recalled that Brooks accompanied him back to the bar to get his change.

Agent Bowling testified that he and Agent Gaskins returned to the bar on April 4, 1990, and that basically the same scenario occurred. The defendant was again seated at the end of the bar. Agent Bowling purchased cocaine from Brooks in the restroom and accompanied Brooks to the bar to get his change.

Agent Bowling testified that he and TBI Agent Pat Howell went to the Boondocks Saloon on February 20, 1991. Agent Bowling recalled that he told Brooks that he was interested in making a purchase. While he was on his way to the restroom, he noticed that Brooks went into the back room or kitchen area of the saloon. Brooks arrived in the restroom a minute later and sold him a package of cocaine that was wrapped in tinfoil. On this occasion, the defendant was seated at the end of the bar.

On April 17, 1991, Agent Bowling returned to the bar with Howell and told Brooks that he wanted to buy two eight balls. He recalled walking to the restroom while Brooks entered the back room or kitchen area. He said that Brooks arrived in the restroom a minute later with two foil-wrapped packages of cocaine. After he purchased the cocaine, Agent Bowling went to the bar area where he observed the defendant and Brooks entering the kitchen area. He said that Brooks and the defendant had a brief conversation and that the defendant then returned to his seat at the end of the bar. As Agent Bowling was leaving the bar, he noticed that the defendant placed his hand in his left front pocket.

Agent Bowling admitted that he never approached the defendant to buy cocaine and that, although the defendant was at the saloon, the defendant was never present during any of the drug transactions. He also explained that the cocaine he

4

purchased at the Boondocks Saloon was always packed in a clear plastic bag that had the corner cut at an angle and heat sealed. Some of the bags had also been wrapped in foil.

After purchasing the two eight balls from Ricky Brooks on April 17, 1991, Agent Bowling obtained a search warrant and returned to the saloon. When he executed the warrant, he confiscated seventy-four twenty-dollar bills, seventy-one one-hundred dollar bills, a wallet that had one-hundred and twenty dollars in it, and a .25 caliber automatic pistol from the defendant. Agent Bowling recalled that the defendant did not have any of the money that he had used that night to buy cocaine from Brooks. All of the money used for the cocaine buy on April 17, 1991, was recovered from Brooks.

Agent Bowling also testified that he confiscated two loaded rifles, one behind the bar area and the other in the back room, and found four night sticks under the bar. He said that a .357 revolver was found in a bag under the bar. He recalled that a change purse containing cocaine was taken off of Brooks and that a magnetic key holder containing fifteen small bags of cocaine was found in the back room along with a package of cocaine wrapped in tinfoil. He also said that money in and under the cash register and several bottles of liquor were found during the search. He described what he considered to be drug paraphernalia that was found during the search, including corners that had been cut from plastic bags and tinfoil that had been cut.

After the bar had been searched, the defendant and Ricky Brooks were arrested. Agent Bowling recalled that both men were placed in the back of the same patrol car and left alone while a small recorder taped their conversation. Agent Bowling listened to the recording later that night and helped identify their voices and prepare a transcript of the tape. Agent Bowling explained that he could distinguish the

5

defendant's voice from Brooks' because he had been talking to Brooks over the past sixteen months. He said that he had heard the defendant's voice that night and that he also talked to the defendant after he was indicted. He recalled arresting the defendant after he was indicted and said that, at that time, the defendant did not have any weapons on him but was carrying nine hundred and seventy-four dollars in his front pocket.

Agent Bowling admitted that the defendant was never within hearing distance of any of the conversations that he had with anyone at the bar of the saloon. He said that on one occasion another officer saw the defendant nod at Brooks. He said that the other officer called the nod to his attention but that he did not recall whether he saw it. Agent Bowling acknowledged that he did not find the defendant's fingerprints on any of the cocaine, paraphernalia, money or other contraband that was confiscated. He said that he based his arrest of the defendant on the fact that he owned the Boondocks Saloon, noting that the defendant did not do anything on April 17, 1991, to indicate that he was involved in the sale.

Agent Bowling said that he saw Al Smith, whom he had known since his childhood, in the Boondocks Saloon on one occasion in 1990. He could not recall whether Smith was sitting with the defendant, but he said that he told Smith not to disclose that he was a TBI agent because it would jeopardize the undercover operation.

Ron Gaskins, a special agent with the TBI drug enforcement unit, testified that he accompanied Agent Bowling to the Boondocks Saloon on February 21, 1990. He said that he sat at the bar while Agent Bowling had a conversation with Brooks who was behind the bar. Toward the end of the conversation, Agent Gaskins noticed the defendant nod at Brooks. Agent Gaskins then watched Agent Bowling walk to the restroom where he met with Brooks to purchase cocaine. Agent Gaskins said that, to

6

the best of his knowledge, the night he saw the defendant nod was the first time that Agent Bowling purchased cocaine directly from Brooks. Agent Gaskins also recalled that he searched the defendant during the April 17 raid of the saloon and found eight thousand five hundred and eighty dollars in the defendant's front pocket, one hundred and twenty dollars in his wallet, and a loaded .25 automatic pistol in the defendant's back pocket.

TBI agents, Patrick Howell and Jerry Tinnery, also participated in the search of the Boondocks Saloon. Agent Howell testified that he found cocaine in the back room on the top shelf hidden inside a roll of duct tape. Tinnery testified that he found a loaded .357 magnum pistol under the bar and a loaded semi-automatic pistol in the garage area of the building. He said that both guns were in cloth Crown Royal bags and that the gun in the garage area of the building was under the seat of a truck.

Another TBI agent, David Blackwell, testified that he enhanced a micro-cassette tape that he received from Agent Bowling. He explained that enhancing a tape involves reducing the noise that surrounds the voice and does not change the content of the tape.

Eddie Bass, the sheriff of Giles County, testified that, as a deputy sheriff, he participated in the search of the Boondocks Saloon on April 17, 1991. He said that he recovered a magnetic key holder containing plastic bags of cocaine from a box that was on a shelf in the back room. A plastic yellow file box and some other business-related items were also on the shelf. The parties stipulated that the key holder contained 5.6 grams of cocaine separated into fifteen bags. Sheriff Bass also testified that he recovered small pieces of tinfoil, scissors, plastic bags, corners that had been cut from plastic bags, and a box of tinfoil from a cabinet in a room near the garage area.

He explained that the garage area was located in a separate building that was not connected to the Boondocks Saloon.

Sheriff Bass recalled placing the defendant and Brooks in the back of his patrol car. Before placing the men in the car, he turned on a tape recorder that was hooked to a small microphone to monitor any conversation between the two men. He said that he left the defendant and Brooks alone in the car for, at most, twenty or thirty minutes but that he returned to the car once or twice during that time and verified that the recorder was working. Sheriff Bass testified that he listened to the tape that was recorded that night and that, in his opinion, the transcript of the tape Agent Bowling helped prepare is accurate.

The original tape, an enhanced tape, and the transcript of the tape were introduced at trial. The enhanced tape was played for the jury after each member of the jury had been given a copy of the transcript. The tape contains a conversation between the defendant and Brooks during which the defendant asked Brooks if he was "caught with any." After Brooks replied, "just a few," the defendant advised him to tell the authorities that he bought it from a person at the mall for his own personal use. The defendant also told Brooks not to speak to the authorities other than to request an attorney. Brooks assured the defendant that everything was in his name and that he would take full responsibility for all of it. The defendant told Brooks that the beer board would automatically revoke the license for the Boondocks Saloon and said, "we just got through buying new ones, didn't we." At another point in the conversation, Brooks replied to an inaudible question from the defendant by informing him that "it" was hidden under a woodpile. The defendant responded by asking Brooks where the stuff was under the woodpile in case he made bail, and Brooks specified that it was in tupperware at the end of the trailer and that the defendant would have to move some

8

sticks to get to it. The tape also captured the defendant asking Brooks whether he had sold to "one of them boys there in that striped shirt."

TBI Agent Richard M. Gilliland, testified that he was working surveillance at the Boondocks Saloon on April 17, 1991. He said that he entered the bar after Agent Bowling and Agent Howell had left to secure a search warrant and sat at a table in the saloon until they returned with a warrant forty-five minutes to an hour later. While he was waiting for the warrant, Gilliland saw three men enter the bar at different times. Each man talked to Brooks and then entered the restroom.

After Brooks and the first man left the restroom, Brooks spoke briefly to the defendant, and the defendant nodded. Brooks went behind the bar through the kitchen area to the back room where he reached behind the yellow file box. He then returned to the restroom with the first man. Gilliland testified that, a short time later, the second man entered the bar and the same scenario occurred. Brooks and the man left the restroom. Brooks spoke to the defendant, who nodded, then Brooks went to the back room, reached behind the file box, and returned to the restroom with the man.

Brooks talked to the defendant again while the third man who had entered the bar was in the restroom. Gilliland said that he saw the defendant nod and that Brooks went to the back room and reached behind the file box. A short time later Brooks returned to the bar and had another conversation with the defendant. Then, Gilliland observed the defendant and Brooks walk into the back room. He testified that the defendant moved the file box while Brooks reached behind it. Gilliland said that a few minutes later the defendant returned to his seat at the end of the bar, and Brooks returned to the restroom with the third man.

9

Agent Gilliland also identified the small packages of cocaine that were seized from the Boondocks Saloon as being packaged for resale. On cross-examination, he admitted that he did not mention the defendant's nods or his conversations with Brooks in the surveillance report he dictated on April 19, 1991.

Al Smith testified that he was sitting at the bar talking with the defendant and two other friends one Wednesday night when he saw Agent Bowling in the Boondocks Saloon. Smith said that the defendant was present and within hearing distance when he commented that Agent Bowling was a TBI agent. Smith recalled having a conversation with Agent Bowling in the restroom later that night but said that he did not remember what they discussed.

Ernest Thacker of the Tennessee Alcohol Beverage Commission testified that both the beer and business licenses for the Boondocks Saloon were in Ricky Brooks' name. He said that eight open bottles and forty-four unopened bottles of liquor were found in the back room and garage area of the Boondocks Saloon and that he charged Linda Willard with selling liquor and Ricky Brooks with possessing the liquor. He did not bring any charges against the defendant.

Carol Wade, a deputy clerk with the Giles County clerk's office, testified that Ricky Brooks paid and received credit for the property tax on the Boondocks Saloon in February 1991. Wade also identified a copy of a tax receipt, which showed that Ricky Brooks paid the business tax for the Boondocks Saloon on April 12, 1990, and a business tax form that was filled out in April of 1991 for Ricky Brooks to renew the Boondocks Saloon's business license. Wade said that the business license for the Boondocks Saloon was issued to Ricky Brooks.

Truman Raines, the accountant who prepared Ricky Brooks' tax returns, testified that Brooks' 1990 and 1991 tax returns reflect that Brooks paid the defendant rent for the Boondocks Saloon. Raines testified that the returns were filed timely and had not been recently prepared.

An environmental specialist working with the health department, Jeff Braley, testified that the state issued Ricky Brooks a food service permit for the Boondocks Saloon. He said that he did not verify the information on the application for the permit but that because the permit was issued to Brooks, Brooks was the person subject to fines and punishment if the Boondocks Saloon violated any health regulations. Braley recalled inspecting the Boondocks Saloon on several occasions, but he did not recognize the defendant or recall seeing him at the saloon. He said that he saw Ricky Brooks or some of his employees during the inspections and that the inspections occurred during the day.

Mary McGaughy, the custodian of records for the Tennessee Department of Revenue, testified that Ricky Brooks filled out an application for and was issued a certificate of registration for sales and use tax for the Boondocks Saloon. McGaughy said that she usually verifies information on an application by looking at the Department of Revenue records. She recalled looking at all the records for the Boondocks Saloon dating back to 1983 when it was first opened and said that the defendant's name did not appear on any of them. She explained, though, that it is possible that a person could be a co-owner of a bar without being named on the tax permit application. McGaughy also identified copies of the sales and use tax returns Brooks filed and checks showing that he paid them every month from April of 1989 until April of 1991. She said that Brooks notified the tax payer services that he wanted the business closed on April 30, 1991.

11

Larry Brock testified that he had a farm store in 1991, and that on April 15, 1991 he bought a ford tractor, a trailer, and a heavy duty box scraper from the defendant. He said that he paid the defendant five thousand two hundred dollars in cash for the equipment, and a bill of sale for the equipment was introduced. Brock explained that the defendant used one of his forms to write the bill of sale on April 15 and that he, Brock, signed it.

Stephen Owen Scott testified that he paid the defendant two thousand dollars in cash for a four-wheeler he bought from him on April 12, 1991. A bill of sale from the transaction was introduced. Scott said that he got the bill of sale form from Larry Brock and that the defendant completed it.

Peggy Holt, the head bookkeeper at the Bank of Ardmore, testified during the state's rebuttal. She said that both the defendant and Ricky Brooks have ownership rights to the Boondocks Saloon's checking account because both are on the signature card for the account. She explained that the card was updated in 1989 and that before that time another person along with the defendant and Brooks were on the card. She said that she did not meet with either the defendant or Brooks when the card was signed and that she does not know whether they signed the card at the same time.

## I. SUFFICIENCY OF THE EVIDENCE

In his first issue, the defendant challenges the sufficiency of the convicting evidence. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all

12

reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

A conviction for cocaine possession may be based upon either actual or constructive possession. State v. Cooper, 736 S.W.2d 125 (Tenn. Crim. App. 1987). "Before a person can be found to constructively possess a drug, it must appear that the person has 'the power and intention at a given time to exercise dominion and control over . . . [the drugs] either directly or through others.'" Id. at 129 (citations omitted). Standing alone, a defendant's mere association with a person who possesses drugs or presence in a place where drugs are found are insufficient to establish constructive possession. Id.

When viewed in the light most favorable to the state, the proof in this case established more than the defendant's association with Brooks or his presence in the Boondocks Saloon where drugs were found. Brooks and his employees were involved in selling drugs out of the Boondocks Saloon over a sixteen-month period. The defendant was the owner of the Boondocks Saloon and had an ownership interest in the saloon's checking account.

The proof showed that before Agent Bowling purchased cocaine from Brooks on February 20, 1990, the defendant nodded at Brooks before the sale. On April 17, 1991, the defendant went to the kitchen area and had a brief conversation with Brooks after Brooks had sold Agent Bowling cocaine. While Agent Bowling was gone to obtain a warrant, three men entered the saloon at different times. Each man talked to Brooks and then entered the restroom where previous cocaine sales had taken place. Before joining each man in the restroom, Brooks talked to the defendant, who nodded, and entered the back room where cocaine was later found. After Brooks had

13

met the third man in the restroom, he returned to the bar and had another conversation with the defendant. The defendant then accompanied Brooks to the back room where he moved a file box while Brooks reached behind it. A magnetic key holder containing plastic bags of cocaine was later confiscated from a box that was on the shelf with the file box, and the defendant had eight thousand seven hundred dollars in his pockets when he was arrested.

After Brooks and the defendant had been placed in the back of the police car, the defendant asked Brooks whether he was "caught with any." The agents had confiscated a change purse with cocaine in it from Brooks, and Brooks replied that he was caught with a few. The defendant advised Brooks to tell the police that he bought it off a person in the mall for his own personal use. The defendant remarked that the licenses for the Boondocks Saloon would automatically be suspended and that "we," had just renewed them. The defendant also questioned Brooks about where the "stuff" was located in case he made bail.

Given the above evidence, the jury, as a rational trier of fact could have concluded beyond a reasonable doubt that the defendant had both the power and the intent to exercise control over the cocaine seized. Thus, sufficient evidence was presented to support his conviction.

## II. ADMISSION OF WEAPONS

In his next issue, the defendant challenges the trial court's admission of weapons into evidence. He argues that the pistol police confiscated from him, along with the other guns and night sticks that were seized from the Boondocks Saloon, should not have been admitted into evidence because they were irrelevant and prejudicial. The state counters that the gun found in the defendant's possession and the weapons found in strategic places throughout the Boondocks Saloon were relevant

14

as circumstantial evidence of the defendant's intent to possess cocaine for sale. The state reasons that the weapons were used to protect the large amounts of money and drugs involved in the cocaine sales.

The admissibility of evidence as more probative than prejudicial is a matter within the trial court's discretion and will not be reversed on appeal absent a showing of an abuse of that discretion. State v. Harris, 839 S.W.2d 54, 66 (Tenn. 1992). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. If the probative value of relevant evidence is "substantially outweighed by the danger of unfair prejudice," it may be excluded. Tenn. R. Evid. 403.

In this case, the trial court concluded that the weapons were relevant to the jury's assessment of the situation that existed at the Boondocks Saloon on April 17, 1991. Although we view the probative value of the weapons as minimal, we do not believe that the trial court abused its discretion by admitting evidence of the weapons or that the danger of unfair prejudice substantially outweighs the probative value.

### III. ADMISSION OF OTHER COCAINE SALES

Next, the defendant contends that the trial court erred by allowing the state to introduce evidence of cocaine sales by Ricky Brooks, Linda and Sonny Willard, and Terry Thompson. He argues that Agent Bowling's testimony relating to drug sales by other individuals was irrelevant and should have been excluded as evidence of prior bad acts under Rule 404(b), Tenn. R. Evid. The state asserts that proof of cocaine sales by other people at the Boondocks Saloon was relevant because the defendant's presence during the sales was indicative of his intent to possess drugs for sale on April 17, 1991.

15

Rule 404(b), Tenn. R. Evid, prohibits the introduction of evidence of other crimes or acts, except when the evidence of other acts is relevant to a litigated issue, such as identity, intent, or rebuttal of accident or mistake, and its probative value is not outweighed by the danger of unfair prejudice. The rule states:

**(b) Other Crimes, Wrongs, or Acts.**
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

The Advisory Commission Comment to the rule notes that under the procedure, the trial court must find that the evidence of the other crimes is "clear and convincing" as required by State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985). When a trial court substantially complies with the procedural requirements of the rule, its determination will not be overturned absent an abuse of discretion. State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997).

In this case, the trial court addressed the admissibility of the prior drug transactions during a pretrial hearing and again at trial during a hearing outside the presence of the jury. During pretrial hearings, the parties stipulated that the defendant owned the saloon and that Brooks leased it from him. The trial court also heard the tape of the conversation between the defendant and Brooks after they were arrested. At the jury-out hearing, Agent Bowling testified about the various drug transactions that took place at the Boondocks Saloon during the sixteen-month sting operation.

16

The trial court ruled that the evidence of the prior drug sales was admissible because it found that there was clear and convincing evidence that the defendant was connected to the prior drug sales and that their probative value outweighed the danger of unfair prejudice. The court reasoned that the prior sales tended to show a common scheme or plan that corroborated other testimony about the offense and was probative of the defendant's relationship with Brooks and of the operation of the bar. Given the court's compliance with the procedural requirements of Rule 404(b), its ruling will not be disturbed absent an abuse of discretion. See id.

The defendant contends that the record does not support the trial court's finding that the defendant was involved in the prior drug sales. We disagree. The proof showed that the defendant owned the saloon, was present in the saloon during the prior sales, and gave a nod of approval before one of the sales. The tape of the defendant's and Brooks' conversation after their arrest reflects that the defendant asked Brooks whether he was caught "with any," whether he had sold to "one of them boys there in that striped shirt," and where the "stuff" was located in case he made bail. The tape also captured the defendant remarking that the beer board would revoke the saloon's license and that "we just got through buying new ones." We believe that the trial court was justified in concluding that the defendant was involved with the prior sales.

Moreover, we view the pattern of prior drug sales as being probative of the defendant's knowledge and intent to possess cocaine for resale on April 17, 1991. See Russell v. State, 556 S.W.2d 92, 93 (Tenn. Crim. App. 1977) (proof of defendant's possession of marijuana relevant to the defendant's guilty knowledge and intent to possess PCP). The trial court acted within its discretion when it determined that the probative value of proof of the prior sales outweighed the danger of unfair prejudice.

## IV. ADMISSION OF TAPE

Next, the defendant challenges the admission of the tape recording of the conversation that he and Ricky Brooks had in the back of the police car. He contends that the tape recording was not adequately monitored in order for the voices on the tape to be identified with certainty. He also argues that the tape should have been redacted to exclude prejudicial comments made by Ricky Brooks. We disagree with the defendant's contentions.

Sheriff Bass testified that he placed the defendant and Brooks in the back of his patrol car and activated the tape recorder. He said that he returned to the car once or twice and verified that the recorder was working. Both Agent Gilliland and Sheriff Bass testified that Brooks' and the defendant's voices were on the tape. Agent Gilliland explained that he was familiar with the voice of Ricky Brooks because he had talked to him several times during the sixteen-month sting operation. Agent Gilliland also said that he had talked to the defendant before making a transcript of the tape and that he did not have any trouble identifying the voices on the tape. In our view, the tape was sufficiently authenticated, see Tenn. R. Evid. 901, and the state laid an adequate foundation for its admission.

The defendant contends that some of Brooks' statements should have been redacted from the tape because he did not have the opportunity to confront Brooks at trial. Specifically, the defendant challenges the following underlined excerpts from the tape:

> TILLERY: Did they catch you with any?
>
> BROOKS: <u>Just a few</u>. They ain't got a . . . leg to stand on.
>
> TILLERY: -- risking everything. I ain't gonna pay 'em nothing . . . I was just fixing to walk out the door, too. Just tell 'em if they ask you where you got it, you bought it off [a person at the mall] and for your own personal use or something. . . . Don't even tell 'em that - tell 'em you want to see an attorney. . . .

18

. . .

TILLERY: How many did he get off of you?

BROOKS: Um. <u>about seven or eight</u>.

. . .

TILLERY: I knew they was coming. I just didn't know when. I mean they called me . . . you know called and told me.

BROOKS: Um. Don't know how much money I had in the . . . balance.

TILLERY: . . . I had about eight thousand dollars in my pocket. And they got me with a pistol.

BROOKS: Can you not claim . . .

TILLERY: Any other time I'd had that . . . in my . . . truck.

BROOKS: <u>It's all in my name and I'll just take full responsibility for all of it. You didn't have nothing to do with nothing</u>.

TILLERY: . . . nobody that could testify against you. You ain't sold to one of them boys there in that striped shirt.

BROOKS: [Two of them have been coming in there for two years.]

TILLERY: That who you sold to?

BROOKS: (Unintelligible)

TILLERY: Yeah, I know them too . . . them's some big boys too, is TBI.

. . .

BROOKS: [They have] been coming in here for two years.

TILLERY: I know they been - that's what I'm saying - they been . . . coming up here - they was coming up here when George . . . .

BROOKS: Um. <u>What do you got in that building round yonder</u>?

TILLERY: Ain't nothin in there - I cleaned that . . . out. . . . all Todd's baseball cards are in that . . . safe.

. . .

TILLERY: Does Captown (unintelligible) know where that's at down there? Where's (Unintelligible)?

19

BROOKS: <u>It's hid out there under that woodpile</u>.

TILLERY: How come (unintelligible) one under the shed?
. . .

TILLERY: Where - abouts under that woodpile is that stuff at, Brooks, if I make bail?

BROOKS: <u>It's in the . . . at the end of the trailer . . . it's next - about middle ways - you have to move about five or six sticks over and it's in a tupperware . . . . Don't even worry about this - I - they can't get shit on you.</u>

TILLERY: (Unintelligible)

BROOKS: <u>I'll keep my f----n' mouth shut and f--k them son of a bitches.</u>

TILLERY: Don't say nothing until you get a f----n' attorney there.

BROOKS: I ain't. I ain't stupid. I'll take care of it.

The defendant argues that the admission of Brooks' statements prejudiced his right to a fair trial because he did not have the opportunity to cross-examine Brooks.

Our supreme court addressed a similar argument in <u>State v. Jones</u>, 598 S.W.2d 209 (Tenn. 1980). The defendant in <u>Jones</u> was convicted of solicitation to commit robbery, based in part on the comments he made during taped discussions with Helen Risler, who was working as an undercover agent. Ms. Risler did not testify at the defendant's trial, and the defendant objected to the introduction of the tapes on hearsay and confrontation grounds. The court rejected the defendant's hearsay argument because Risler's statements were not offered for the truth of the matter asserted. The court also concluded that a confrontation issue did not arise with respect to Ms. Risler's "conversational activities." <u>Id</u>. at 223. The court noted that a confrontation problem did not arise with respect to the defendant's statements on the tape because the defendant had a full opportunity to cross-examine the witnesses that testified to the statements that he made. <u>Id</u>. at 224.

20

As in Jones, Brooks' remarks on the tape in this case were not offered for their truth but instead were admitted only because they provide meaning to the defendant's statements. In this vein, the jury was instructed, "Concerning the tape recording and the compared transcript, you are instructed that only statements, admissions and declarations of declarant-defendant may be considered in question of guilt or innocence." We presume that the jury followed the court's instructions. See State v. Johnson, 762 S.W.2d 110, 116 (Tenn. 1988). Admission of the tape did not violate the defendant's confrontation rights.

## V. CIRCUMSTANTIAL EVIDENCE INSTRUCTION

Next, the defendant contends that the trial court erred by refusing to give the circumstantial evidence jury instruction that he requested. The state counters that the circumstantial evidence instruction given by the trial court completely and adequately stated the law.

At the defendant's trial, the trial court gave the following instruction on direct and circumstantial evidence:

> One type of evidence is called direct evidence and the other type is called circumstantial evidence.

> Direct evidence is those parts of the testimony admitted in court which referred to what happened and was testified to by witnesses who saw or heard or otherwise sensed what happened first hand. If witnesses testified about what they themselves saw or heard or otherwise sensed, they presented direct evidence.

> Circumstantial evidence is all the testimony and exhibits which give you clues about what happened in an indirect way. It consists of all the evidence which is not direct evidence.

> Do not assume that direct evidence is always better than circumstantial evidence. According to our laws, direct evidence is not necessarily better than circumstantial evidence. Either type of evidence can prove a fact if it is convincing enough. A defendant may be convicted on direct evidence, circumstantial evidence, or both. When the evidence is entirely circumstantial, then before you would be justified in finding the defendant guilty, you must find that all the essential

21

facts are consistent with the theory of guilt, and the facts must exclude every other reasonable theory except that of guilt.

See T.P.I.-Crim. 42.03(a) (4th ed.) (alternative instruction on direct and circumstantial evidence).

The defendant requested the following instruction:

The guilt of the defendant as well as any fact required to be proved may be established by direct evidence, by circumstantial evidence, or by both combined.

Direct evidence is defined as evidence which proves the existence of the fact in issue without inference or presumption. Direct evidence may consist of testimony of a person who has perceived by the means of his or her senses the existence of a fact sought to be proved or disproved.

Circumstantial evidence consists of proof of collateral facts and circumstances which do not directly prove the fact in issue but from which that fact may be logically inferred.

When the evidence is made up entirely of circumstantial evidence, then before you would be justified in finding the defendant guilty, you must find that all the essential facts are consistent with the hypothesis of guilt, as that is to be compared with all the facts proved; the facts must exclude every other reasonable theory or hypothesis except that of guilt; and the facts must establish such a certainty of guilt of the defendant as to convince the mind beyond a reasonable doubt that the defendant is the one who committed the offense. It is not necessary that each particular fact should be proved beyond a reasonable doubt if enough facts are proved to satisfy the jury beyond a reasonable doubt of all the facts necessary to constitute the crime charged. Before a verdict of guilty is justified the circumstances, taken together, must be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion and producing in effect a moral certainty that the defendant and no one else committed the offense.

(emphasis added); see T.P.I.-Crim. 42.03 (4th ed.). The defendant argues that this instruction would have been the most appropriate charge for the jury to hear because it included the emphasized language.

Initially, we note that this language primarily relates to the state's burden of proving the defendant's guilt beyond a reasonable doubt. However, the trial court

22

instructed the jury that the state had the burden of proving each of the elements of the offense beyond a reasonable doubt. Thus, the trial court's instructions on how to consider circumstantial evidence and what constitutes reasonable doubt essentially provide what the defendant requested.

A trial court has a duty to give a complete charge of the law applicable to the facts of the case. State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975). However, Tennessee law does not mandate any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. State v. West, 844 S.W.2d 144, 151 (Tenn. 1992). Although trial courts should give requested instructions that are supported by the evidence, that embody a party's theory, and that are a correct statement of the law, trial courts are not required to give requested instructions if the substance of the instructions are covered in the general charge. Mitchell v. Smith, 779 S.W.2d 384, 390 (Tenn. Ct. App. 1989). In our opinion, the trial court conveyed the substance of the requested instruction and adequately stated the standard for weighing circumstantial evidence.

## VI. CONSTRUCTIVE POSSESSION INSTRUCTION

The defendant contends that the trial court erred by refusing to give the constructive possession instruction that he requested. The trial court gave the following instruction on actual and constructive possession:

> There are two types of possession recognized in the law: actual possession and constructive possession. A person who knowingly has direct physical control over an object at a given time is then in actual possession of it. A person who, although not in actual possession, knowingly has both the power and intention at any given time to exercise domain and control over an object is then in constructive possession of it.

See T.P.I.-Crim. 31.04 (4th ed.).

In accordance with State v. Cooper, 736 S.W.2d 125 (Tenn. Crim. App. 1987), the defendant requested that the jury be instructed:

> The mere presence of a person in an area where drugs are discovered is not, alone, sufficient to support a finding that the person possessed the drugs. Likewise, mere association with a person who does in fact control the drugs or property where the drugs are discovered is insufficient to support a finding that the person possessed the drugs.

Although we agree with the defendant that this instruction is a correct statement of the law, embodies his defense theory, and is not specifically contained in the charge given, the defendant suffered no prejudice from the trial court's refusal to give the instruction. The substance of the requested instruction is inherent in the court's instruction that constructive possession requires that the defendant have both the power and intention to exercise control over an object. See State v. Milton Jerome Johnson and Adrian B. Pendleton, No. 139, Shelby County, slip op. at 4-5 (Tenn. Crim. App. Mar. 20, 1991) (holding that it was not error for trial court to deny the same requested instruction when instructions given adequately stated the law on actual and constructive possession and circumstantial evidence). Therefore, the defendant is not entitled to relief on this issue.

24

## VII.  SENTENCING

Finally, the defendant challenges the length and manner of service of his sentence.  The state responds that the trial court properly sentenced the defendant to serve ten years in the custody of the Department of Correction.

At the sentencing hearing, Sheriff Bass testified that Giles County had a drug problem, with cocaine in particular.  He stated that cocaine trafficking was particularly heavy at the Boondocks Saloon.  He said that nine out of ten people caught dealing cocaine refuse to assist police in gathering evidence against their suppliers because probation is ordinarily granted.  Sheriff Bass testified that as a result, there was no deterrent or incentive for a person to act as an informant.  On cross-examination, Sheriff Bass conceded that to an extent, those who are convicted of drug trafficking, granted probation and traffick again are also without family support.

Jimmy Anderson, a teacher and coach at Ardmore High School, testified that drugs are a particular problem in the county.  He said that the defendant was active in the Ardmore Community Booster Club.  Mr. Anderson stated that the defendant also helped at the high school and was involved in the sports programs at the school.  He described the defendant as being respectful and being one of the nicest people he had ever known.  Mr. Anderson also testified that the defendant encouraged young people to go to school and helped the elderly.  He stated that the defendant had close ties with his family as well as with the community.

Other witnesses testified regarding the defendant's good character and strong ties to his family and community.  An owner of a funeral home testified that he would offer the defendant a job if he was placed on probation.  He said that the defendant and his family are highly respected in the community.  He stated that the defendant is devoted to his wife and son and also helps his mother who is a widow.

25

Helen Stagner, the owner of a local newspaper, testified that the community had a problem with drugs. She also testified regarding the defendant's devotion to his mother, wife and son. She stated that the defendant is a hard worker who helps the elderly and sick in the community. She said that he had a reputation of being dependable and trustworthy. Ms. Stagner denied knowing that the defendant had a reputation for being a drug dealer.

The defendant introduced proof relating to the sentences imposed over the past eighteen months in twelve drug cases in Giles County. Each of the defendants in the twelve cases received either a full probation, split confinement, or a community corrections sentence.

The presentence report reflects that the then forty-seven-year-old defendant had no prior criminal record other than for speeding. It states that the defendant dropped out of school in the eleventh grade but later earned his GED and a degree in automation management. The presentence report shows that the defendant had been self-employed since 1977. It also states that the defendant served in the United States Navy for three years, received an honorable discharge, and then served three years in the Naval Reserves. The report reflects that while serving in the military, the defendant was diligent in his duties, an inspiration to his subordinates, a contribution to good morale, and a good worker in that he was neat and orderly.

The presentence report also contains a statement by the defendant. It states that the defendant's conduct has been a source of embarrassment, ridicule and heartache for the defendant and his family. He also expressed remorse and a desire to be released into the community in order to continue to care for his family. The defendant also stated that he would abide by any conditions of release, including submitting to drug and alcohol testing and securing other types of employment.

26

A community corrections eligibility report was also introduced at the hearing. The report reflects that the defendant met the eligibility requirement for sentencing to the community corrections program.

At the conclusion of the hearing, the trial court sentenced the defendant as a Range I, standard offender to ten years incarceration and fined the defendant twenty-five thousand dollars. In sentencing the defendant, the trial court applied two enhancement factors pursuant to T.C.A. § 40-35-114:

> (2) The defendant was a leader in the commission of an offense involving two (2) or more criminal actors; and
>
> (9) The defendant possessed or employed a firearm during the commission of the offense.

Important in the trial court's decision to apply factor (2) was the defendant's statements to Brooks while in the police car that Brooks should tell the police that Brooks purchased the cocaine from someone at the mall for his own personal use. The trial court also considered the facts of the case and found that the drug transactions were an ongoing operation.

The trial court stated that it found no mitigating factors. Specifically, the trial court refused to apply in mitigation that the defendant's criminal conduct neither caused nor threatened serious bodily injury and that the defendant played a minor role in the commission of the offense. See T.C.A. § 40-35-113(1) and (4). However, in sentencing the defendant, the trial court noted that it must consider the defendant's past record. In this respect, it found that the defendant had no prior criminal record. The trial court also found that the defendant had strong family ties and helped the elderly and others in the community. The trial court also stated:

> Of course, the court has to take everything into consideration, not only the fact that a person is a good friend and a good neighbor and a good acquaintance and is active in civic affairs and school affairs and encourages young people to go to school and improve themselves. The court has to also

look at the overall situation concerning the crime that lead to this conviction.

With respect to alternative sentencing, the trial court stated that the defendant was not eligible for probation because it was imposing a sentence of more than eight years. The trial court refused to impose a community corrections sentence based on the need for deterrence. The trial court found that there was a drug problem in Giles County. It stated that "if there's anything that needs to be deterred, it's the drug business in this country." The court also stated, "To take a defendant who has the ability that no doubt Mr. Tillery had, that elected to sit around the Boondocks Saloon and oversee drug sales, now, that needs to be deterred."

## A. LENGTH OF SENTENCE

The defendant challenges the length of his sentence by arguing that the trial court improperly applied enhancement factors and failed to apply mitigating factors. The defendant contends that he should have received the minimum sentence of eight years because the applicable enhancement and mitigating factors "cancel out."

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section notes, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

28

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103 and -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The sentence to be imposed by the trial court is presumptively the minimum in the range unless there are enhancement factors present. T.C.A. § 40-35-210(c).[1] Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d) and (e).

The defendant contests the application of enhancement factor (2), involving the defendant being a leader in the commission of the offense. He argues

---

[1] For Class A felonies committed on or after July 1, 1995, the presumptive sentence is the midpoint of the range. See T.C.A. § 40-35-210(c).

that the trial court improperly relied upon the tape of the conversation he had with Brooks because it was improperly admitted. He also asserts that the evidence was insufficient to warrant the trial court's conclusion that he was "the leader" in the commission of the offense.

As previously stated, the tape recording of the conversation between the defendant and Brooks was properly admitted into evidence at the defendant's trial. Thus, the trial court was obligated to consider it in imposing a sentence. See T.C.A. § 40-35-210(b)(1).

Pursuant to T.C.A. § 40-35-114(2), the trial court may consider as an enhancement factor that the defendant "was a leader in the commission of an offense involving two (2) or more criminal actors." (emphasis added). The defendant need not be the sole leader for the factor to apply. State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). Given the defendant's statements to Brooks while in the police car, the defendant's ownership of the Boondocks Saloon, and the defendant's nod at Brooks immediately before one of the cocaine sales, we conclude that the record supports the trial court's determination that the defendant was a leader in the commission of the offense.

The defendant also challenges the application of enhancement factor (9), regarding the possession or employment of a firearm during the commission of an offense. He argues that there is no evidence that he used, displayed or threatened to use or display the pistol at any time and that there was no connection between his commission of the offense and his possession of a pistol.

However, factor (9) only requires a showing that the "defendant possessed or employed a firearm . . . during the commission of the offense." T.C.A. §

40-35-114(9) (emphasis added). The evidence showed that the defendant possessed a loaded .25 caliber pistol at the time of the offense. Several other weapons were confiscated from the Boondocks Saloon, including a shotgun that was located in the same room where cocaine was found. Under these circumstances, we believe a reasonable connection can be made between the defendant's involvement in the possession of cocaine for resale and his possession of the firearm. Thus, the record supports the trial court's determination that the defendant possessed a firearm during the commission of the offense.

The defendant asserts that the trial court erroneously failed to find any mitigating factors applicable despite its findings regarding his good character. He argues that the record was "overflowing with mitigation type evidence, a good deal of which the trial court found on the record but failed to recognize as mitigating." Specifically, he contends that the trial court should have mitigated his sentence because his conduct neither caused nor threatened serious bodily injury and because he played only a minor role in the offense. See T.C.A. § 40-35-113(1) and (4). He also contends that the trial court should have mitigated his sentence based on his showing of remorse and embarrassment, his desire to care for his family, his willingness to follow rules and guidelines and to submit to alcohol and drug tests, his willingness to secure other types of employment, and on the court's duty to impose a proper sentence. See T.C.A. § 40-35-113(13).

We disagree with the defendant's contentions that the trial court should have applied mitigating factor (1), because his conduct did not threaten serious bodily injury, and mitigating factor (4), based on his minor role in the offense. Mitigating factor (1) is not applicable when the offense involves the felonious possession of cocaine. See State v. Charles Fulkerson, No. 03C01-9101-CR-00032, Anderson County, slip op. at 10 (Tenn. Crim. App. Jan. 21, 1992). The record does not support the application of

mitigating factor (4) because the trial court found that the defendant was a leader in the commission of the offense.

With respect to the defendant's remaining contentions, we note that the trial court considered: (1) that this is the defendant's first drug-related conviction, (2) that the defendant was a good friend, a good neighbor, and a good acquaintance, (3) that the defendant had strong family ties and helped the elderly in the community, (4) that the defendant was active in civic and school affairs, and (5) that the defendant encouraged young people to go to school and improve themselves. The trial court weighed these considerations against the circumstances of the offense, the defendant's involvement with cocaine sales over a lengthy period of time, and the need for deterrence and concluded that it would not apply any mitigating factors to the defendant's sentence. In this respect, the trial court essentially recognized potentially mitigating aspects of the defendant's background and amenability to rehabilitation but concluded that they did not warrant any weight. We believe that the trial court acted within its discretion. See Ashby, 823 S.W.2d at 169.

The weight to be afforded an existing enhancement or mitigating factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169. Given the two applicable enhancement factors, we hold that the trial court was justified in imposing a ten-year sentence in this case.

### B. MANNER OF SERVICE OF SENTENCE

The defendant also contends that the trial court erred by denying alternative sentencing. He argues that the trial court erred by basing its denial of an alternative sentence solely on the need for deterrence. He also contends that he

should have been granted a community corrections sentence in order to avoid "sentencing parity."

The defendant acknowledges that he is not eligible for probation because he received a sentence of more than eight years. See T.C.A. § 40-35-303(a). He recognizes that he is not presumed to be a favorable candidate for alternative sentencing options, see T.C.A. § 40-35-102(6), but he argues that he should have been placed on the community corrections program. However, the defendant does not meet the minimum eligibility requirements for a community corrections sentence because he possessed a weapon during the offense. See T.C.A. § 40-36-106(a)(4); see also State v. Grandberry, 803 S.W.2d 706 (Tenn. Crim. App. 1990).

The defendant contends that the trial court erred by refusing to impose an alternative sentence based on the need for deterrence. However, confinement can be particularly suited to deter others similarly situated. See T.C.A. §§ 40-35-102(3)(A) and -103(1)(B); State v. Davis, 940 S.W.2d 558, 560 (Tenn. 1997). In this case, Sheriff

Bass, a high school teacher, and the owner of a local newspaper testified that Giles County had a drug problem. Sheriff Bass said that cocaine trafficking is particularly heavy in the area of the county where the Boondocks Saloon was located. Sheriff Bass testified that because defendants caught with cocaine are frequently given probation in Giles County, there is no deterrence or incentive for them to help police stop the drug trade. Sheriff Bass also said that this case is a highly visible case within the county. We believe that the record supports the trial court's reliance on deterrence.

Finally, the defendant contends that he should have been granted an alternative sentence in order to "insure equal and fair treatment of defendants within Giles County." In support, he refers to proof he introduced relating to the sentences

33

imposed in twelve drug cases in Giles County. We agree with the defendant that one goal of the sentencing act is "to assure fair and consistent treatment of all defendants by eliminating unjustified disparity in sentencing." T.C.A. § 40-35-102(2) (emphasis added). However, each case rests upon its own merits. See Moss, 727 S.W.2d at 235-36. The fact that there is disparity means little when the circumstances are different. In this respect, if the trial court follows the required procedures and duly considers the principles and purposes of the sentencing act in determining a sentence, we need not look to other cases for comparison.

In this case, the trial court considered all of the relevant sentencing principles and followed the sentencing procedures outlined in the act, and the record supports the trial court's conclusions. Therefore, we affirm the sentence the trial court imposed.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
Joseph M. Tipton, Judge

CONCUR:


_____
Gary R. Wade, Judge


_____
Paul G. Summers, Judge